Could the clerk call the next case please? Mr. Horstman, good morning. Please the court, counsel. My name is Jim Horstman. I represent the plaintiff John Hiacek. This is a breach of contract case. John Hiacek contracted to purchase some historic stones from the defendants. He's not affiliated with the defendants, he's an independent collector. The consideration that he paid in this contract for the purchase of the stones was not cash, but a rare painting. The defendants accepted the painting from Mr. Hiacek, but then didn't convey the stones to him. I argue having breached the contract. Mr. Horstman, before you get the rest of the way, could you tell me exactly what the contract is and who the parties were? The these temple stones. And when was that reached? It was reached for the purchase of the temple stones. There's a memorandum, actually two documents, I think it's C-303 and C-304 in the record. There was a memorandum of understanding relating to the conveyance of the stones, and then there was a printed form relating to the receipt by the defendants of the painting. So that the written contract actually consists of those two documents. It's early 2000, February 2000. Okay, I'm asked because I'm having a hard time finding the meeting of the minds here. Well, I think that's probably the best evidence of that. The essence of the contract was that Mr. Hiacek was to receive certain of these temple stones of his choosing by our lights, and in exchange he would pay by conveying this painting, this Maudsley painting. And that's really the basic terms, but I think there's a lot of supporting evidence after the writing of the documents by John Hiacek, and also he dealt primarily with Mr. Leonard, the agent of the defendants, where their conduct in the discussion reflected that that was to be the deal. I do have the record here, and I'm not finding those documents. I've got common law record volume 2, C302 and 303, and I don't see those documents. Maybe it's 4 or 3. You know what, at some point if you would just send us a note, or maybe before rebuttal. In rebuttal I'll be able to tell you exactly. I have the same concerns, Justice McDade, because your client called the transaction a donation, not a purchase. Yeah, well there was, admittedly, there's a lot of this quaint sort of language. What day was the painting delivered to the church, physically delivered? Was it the same day as those two documents were executed? It was February 4th. Okay, because I've tried to carefully go through the record, and in the volume that I have, common law volume 2, page C231, there's an exhibit to the motion for summary judgment, and it is marked as exhibit 7, but I don't know whether it was a deposition exhibit, or whether, I don't think it's the exhibit to the motion for summary judgment being number 7. But the first page at page C231 is a memorandum dated February 4th, and it says, I am pleased to inform you that arrangements have been made for you to select 10 to 15 stones for your personal use from the surplus Nauvoo Temple stones, and there's a BCC notation on the bottom indicating who approved that. Well then, in the same volume, there's another memo that talks about, let me find it again so you guys can reconstruct my own research, it's C169. This is marked as an exhibit 2, and again I'm assuming it's a deposition exhibit. It's the same, it looks like it's the same letter, but it's in a same date. It has the same letterhead, but the body of this letter reads, I am pleased to inform you that arrangements have been made for you to select 10 to 20 stones. And I'm really confused how there's two different letters. One says 15, 10 to 15, and the other says 10 to 20. And they're both dated February 4th, so that causes me to be really concerned, as Justice McDade is, what was the agreement on February 4th? I can begin by telling you the page numbers that I was thinking of. My dyslexia did sort of kick in there. What I was referring to was C403, 405, 407. Okay. Were you aware of these two different documents? I knew that there's two... The handwritten changes on that memo dated February 4th, it says 10 to 20. But there's this other document with the BCC that says 10 to 15, and it bears the same date, but it does not bear any of the handwritten change. Yeah, the difference in the type portion, I don't have an immediate explanation for you. The testimony shows that the memorandum was typed up by Glenn Leonard, and while Leonard and Hinocheck were together, the handwritten additions were put into it. But as far as the difference in the number of the typed things, I don't believe that there's any testimony in the record to explain what the deal is on that. I appreciate that input, and I'm going to ask my clerk just to make copies of those pages that I pointed out to you, for convenience, and I'll get to counsel. Very good, thank you. Isn't really that where the wheels fall off the bus, is that Glenn Leonard works with your client, and they decide to alter the terms of the agreement by allowing your client to select his choice of 10 to 20 stones, and not of surplus, but just of the temple stones. Isn't that where, while they agree to this, that is a change to the contract, or to the understanding, and nobody in authority over Mr. Leonard agreed to that. Isn't that where the agreement falls apart, is over that, over him being allowed to select the stones, and not necessarily the surplus, but a certain type that he specifically wanted? I don't think so. I think there's a misapprehension. It's not a change of the agreement. Glenn Leonard, according to the evidence, did have the authority to negotiate on behalf of the defendants. After he and Hayacek reached the agreement, including the handwritten parts, I'm a little bit surprised by the difference in the typewritten portions, but the evidence shows that the operative memorandum between Leonard and Hayacek was this C405, the typed memorandum that bore Glenn Leonard's additions. He put additional terms on it. And this didn't happen over a long period of time. This happened all at once. So it isn't a change in the terms. I think the record does show that Leonard had the authority of the defendants to negotiate. And the operative one, based on the testimony of Leonard and Hayacek, is going to be the one with the handwritten notations. After the fact, the defendants dispute that Leonard had the authority to do that. They seem to say that he had the authority to enter into the first typed one, but not the authority to handwrite the terms in. But the evidence doesn't show that any period of time passed or that Mr. Leonard wrote the handwritten part in and then went to confer with anybody else. The record shows that he had the authority to negotiate on behalf of the defendants. The record also shows, I think, that people higher up in the organization didn't agree that he should get the stones. There was always this reference to, we need to talk to one more person. We need to get the authority of this person, which is another reason why I'm having trouble finding a meeting of the minds. I don't know who the person who was ultimately authorized to enter into the contract, not do the negotiating, but actually enter into the contract. Well, I think the evidence is that Glenn Leonard had the authority to negotiate. They said, ultimately, Elder Pinnock had to approve it. There's testimony to support John Hyatt's testimony, saying that he was made aware that Elder Pinnock did authorize the deal that was struck. And I think it's not a case of there not being agreement at the outset. It's a case of defendants second-thinking the deal that was made. And in fact, Elder Pinnock does go on to say, several representatives of the defendants say, don't worry, John, you're going to get the stones. Maybe not yet. It may be we need these. It may even be a year. But you're going to get them. They told him, be patient. We're sorry for the delay. All of their conduct recognized that there was a deal. And they encouraged him to stick with them. And they never cut him off. They never said, there is no deal. There never was a contract. For purposes of this appeal, defendants have conceded that there was a contract. I may have been a little bit better able to respond to the questions, but for that fact, the defendants have conceded that there was a contract and raised only these issues of rescission and accord and satisfaction. So that's the predicate of the appeal. So the question is, does the evidence, does the record support this summary judgment on accord and satisfaction and rescission? And the record clearly reflects that the judge acted as a finder of fact, a trier of fact. When he considered this, first of all, the trial judge first considered all the affirmative defenses and denied the motion for summary judgment. It only comes up on a motion for reconsideration, at which point the judge then grants summary judgment on accord and satisfaction and on rescission. But in doing that, he considers a bunch of evidence that was in the defendant's hands before the original ruling on the summary judgment. And critically, it included a number of videotapes and audiotapes. These were the raw exhibits presented to the court in various forms that the trial judge listened to and assessed. The trial judge took Mr. Hiacek up on the stand, took his sworn testimony in connection with the motion to reconsider, and then grants the motion to reconsider and grants summary judgment. So he's hearing live testimony, the judge is. He's looking at these live recordings, audiotapes, drawing whatever interest is, the prior appeal concerned a videotape. And so he's acting as a trier of fact. The record does not unequivocally support either rescission or accord and satisfaction. I'd add that the rescission theory was brand new in the case when defendants filed their motion to reconsider. It was never pleaded and was never argued before the motion to reconsider was heard. One thing I'd like to point out while we're talking about citations to the record, in their briefs, the plaintiffs or the defendants admit that they had all of the exhibits, including the videotapes, before the court ruled on the motion for summary judgment. You see pages 10 and 43 of the defendant's brief. They say, yeah, we admit. We had these recordings after the motion for summary judgment was briefed and argued. And in pages 608 and 609, you see that the plaintiff did supply them on March 20, 2012 with the tapes and the video recordings. The difficulty here is that while defendants can cite to some testimony to suggest that to support their theories for accord and satisfaction and rescission, there is at least an equal amount of testimony and evidence on the other side, showing that John Hiacek believed that the deal was still going to go forward and the defendants in various ways encouraged him, telling him, be patient. You won't have these yet, but to your point, Your Honor, the conduct of both parties did recognize that there was a deal in place. Really, the substantive question here is simply whether the court can find as a matter of law that the contract was rescinded or that it was converted to an accord and satisfaction, when the evidence at very best is equally weighted on both sides. I have some questions. Please indulge me. But I often say at oral arguments, it's our only chance to clear up confusion by going to the source. You argued that the videotapes were available to defendants before the motion to reconsider. That may be true, but wasn't the motion for summary judgment argued on March 9th of 2012, and those tapes were delivered on March 20th? The point I was trying to make... Am I right, or do I misunderstand? I don't remember when the motion for summary judgment was argued. The point I was trying to make is... The judge's opinion letter says oral arguments concerning defendants' motion for summary judgment were heard on March 9th, but his ruling was not issued until April 19th. The ruling was made, I believe, on May 14th. The point I was trying to make was that the defendants had the tapes, the recordings, in their hands as of March 20th, 2012, and then waited two months, and then the trial court ruled on the motion for summary judgment. They had two months where they could have brought up these tapes, did not do so. And then it's not until they file their motion to reconsider that, for the first time, they make use of these materials. Did the court take the matter under advisement on March 9th, then? Yes. So you're saying, while the matter was under advisement, they should have brought this to the court's attention? Yes. So it wouldn't have been a motion to reconsider at that point. They would have had to do what? If they thought they had additional evidence to support their argument, they could have supplemented it. They did nothing, held it for two months, and then brought it up only in connection with the motion to reconsider. And you did touch base on the fact that rescission was not a basis for summary judgment. Is that correct? That's correct. So how did it get injected? Were the pleadings amended? No. It just came up. It was argued by the defendants in their motion for reconsideration. Just as a brand new argument. Were you trial counsel? No. Or are you working off the same record? I'm working off the same record. Was there an objection during the argument on the motion to reconsider that rescission was not led in the motion for summary judgment? Yes, Your Honor. In fact, there was a motion to strike. And that was denied? Yeah. Not expressly, but it swept along with everything else. Okay. If we agree with you that an error occurred, could they raise that in another motion for summary judgment based on rescission? Well, I think they would need to plead it. Sure. But being granted a leave to plead, put that in, I think that would be one of the issues on remand that they would be entitled to. And because of our questions, you didn't have a lot of time to discuss the accord and satisfaction issue. Right. The accord and satisfaction also requires a meeting of the minds to settle a dispute, I believe, on both sides. When they delivered the painting to your client on March 4th of 2000, how would you argue that there was not an accord and satisfaction? The painting was brought without notice or Hiacek's permission to bring it. He asks the delivery person, what's going on, and later asks others connected with the defendants, what's going on. He never gets a straight answer. They don't tell him. Interestingly, when they bring the painting back to Mr. Hiacek, there is a document. It would have been a wonderful document for them to say, we want to rescind or we want to have an accord and satisfaction, but they had him sign just a piece of paper that said, I received the painting. He continues to ask, why are you bringing it back? And they don't tell him. And he continues to ask, and the words that he gets back are inconsistent, but most often he's being told, be patient, we're still willing to give you the stones, we're sorry about the blight. Not by the person delivering the painting, though. No. Later. Subsequently. Later. Right. But he wasn't told anything. He asked the delivery person, what's going on, and the guy basically didn't know, and we have really nothing in the record to show what his authority was. So your position is that by accepting it, there's not an intention to formulate an accord and satisfaction. Right. There was no offer, there was no acceptance, and not even an explanation. When the painting was originally delivered a month earlier, on February 4th, did Mr. Hayajek make arrangements to bring the painting to the church? Did they know it was coming that day? When he brought it to them? A month earlier. I don't think the record says anything about that. Because the same arguments can apply to that delivery of the painting, that just accepting the painting on that day doesn't mean there was an agreement, that there was ongoing negotiations, as evidenced by the handwritten changes on the document. Well, again, I think that you have the documents and the supporting testimony, and again, the fact that defendants have conceded the existence of that contract for purposes of this appeal. But that's the critical point, though, is the beginning of the defendant's breach is when, you know, it isn't the return of the painting so much, it's before that, when the defendants refuse to convey the stones to the plaintiff. So there's some haziness about what the specific terms of the contract were, at least as to the number of stones. I don't think there's an issue regarding them being surplus stones, because that's the only stones there are. They're all surplus stones. You've answered my questions, and I apologize to my colleagues for taking more time. That's fine. Thank you. Thank you, Your Honor. Thank you, Mr. Horstman. Mr. Vincent? Good morning. May it please the Court, Counsel. My name is Josh Vincent. I represent the defendants in Abu Restoration, Inc., Corporation of the President, and Corporation of the Presiding Bishops. I want to start with the question that you asked at the outset of Mr. Horstman about whether there was a meeting of the minds or not. That is an argument that we made in our motion for summary judgment that there was not. And part of that is based on the question of Glenn Leonard's authority, the understanding of how many stones, whether they would be from the surplus stones, whether they would be ones that he would get to select. So we would agree with you that certainly you can affirm the summary judgment on any ground that's supported by the record in one of the arguments in our motion. Unless you conceded that issue for purposes of this appeal. I don't have it conceded. We concede for purposes of this appeal, that's true. But if the Court, you have the authority, certainly, if you feel that there was no meeting of the minds, you could still affirm the judgment on that basis. It doesn't really make a fair play, though, if counsel are making the issues. I agree. And that's why I'm being perfectly up front with you. We do concede it. That's what happens when you deal with the Church. That's right. And it's in our brief. For purposes of today's argument and for purposes of the appeal, we concede the existence of a contract. But like I said, you have the authority to go the other way. I mean, if you looked at my argument outline, you'd see I'm not here to argue that there was no meeting of the minds. What I am here to argue is rescission and accord and satisfaction. That is what happened in this case. You know, the crux of rescission, and that occurs, if you have a party who refuses to perform a contract, and they give you back the consideration, in this case the painting that you tendered, instead of performing. And at that point, if you want to preserve your rights to enforce the contract, to get the stones, then you can't accept the painting back. And you can't act in a manner that is inconsistent with the contract's existence. That's what rescission is all about here. Because what occurred in this case is the Church gave the painting back. I mean, he brought the painting to Salt Lake City on February 4th, as Justice Wright pointed out. Thirty days later, well, the next day he went out, he flew out to Nauvoo, and immediately tried to get the stones. And he was rebuffed. No stones. Go back home. Thirty days, then there's some communication, where he's trying to get this deal back on track. He still wants the stones. Fair, okay? That's conduct by a party who wants to enforce a contract. But now, 30 days later, on March 4th, the painting arrives back at his home, hand-delivered. Well, even before that, on February 23rd, he offered to make a cash donation. That's right. He wrote to them, and he said, you know, that's right, if you don't want the painting, I'll pay cash for the stones. I have five other things I could give you. That's right. He wants to try and do this deal. But on March 4th, he knows the painting is coming. He knows it's being returned to him. How do we know that? It's kind of funny that the prior case that Justice is right, that Brian heard, involved all the video evidence. And here we have a videotape again. It's not the Discovery Channel or the POWs. I'm sorry, Justice Lafayette, it was kind of an amusing moment before in the prior case. But he's, he sets up a camera, Mr. Hijack, in his own living room before the painting even arrives. He's all set. If you've watched that video in the record, you'll see. He's, you know, he's walking around, he's checking out, he sees the guy out of the thing. He's got the camera set up, and he even instructs Kent Woods to put the crate with the, it's just an eight by ten painting, it's not a big painting, put it on the table of the settee right in front of the camera, and he, right there. And what we have is undeniable, decisive, conclusive proof on his own videotape that he created, that he accepted the painting back without any objection. When you, he provided a transcript of his own. Again, we had a transcript of what was said on that video. He submitted a transcript. Our arguments are based totally on the transcript of his very own video that he furnished. And in that video, there is no objection whatsoever to the return of the painting. He signs a receipt for it. More than that, after he gets the painting back, that same day, he makes a recording of his conversation on the phone with Glenn Leonard, the guy back in Salt Lake City that he did the deal with, and he says, why did they return the painting? What's going on? And Glenn Leonard does not tell him anything. There's no evidence to support what Mr. Horstman said about we promised we're going to get you the stones. There is nothing in the record to support that. What is clear from the transcript that both the plaintiff provided and we provided of that audio recording that the plaintiff made, and he's recording all these people, undeniable evidence, is Glenn Leonard says they don't like what I did to the memo. They don't like the changes I made to the memo. They feel that I opened the door too far as to what you could get, and they want to start over. They want to start over. That's consistent in both versions of the transcripts of what Glenn Leonard says in this phone conversation. So we've got undisputed evidence that he accepted the return of the painting, and undisputed evidence that he accepted the return of the painting, knowing why, that they were considering the deal as off, and they wanted to start over. We'll negotiate, but you know what? You're not going to negotiate with Glenn Leonard, the guy in Salt Lake City who has really no involvement with the church in Nauvoo, Illinois, which is run by Elder Pinnock. Elder Pinnock is the head of the Nauvoo Restoration, and he will negotiate with you, because that's the only way the church is going to be able to maintain some control over what stones are given, because Glenn Leonard in Salt Lake City doesn't know anything about these stones, obviously. So he accepts it back with the understanding that they're going to start over. The deal is off. That's the understanding. Now, what happens next? Because that's crucial on both the accord and satisfaction. In the accord and satisfaction, we have the dispute factor. We have the tender, like the tender of the check, that says, here, this is in full payment. Substitute performance, in accord and satisfaction, here, it's the return of the painting instead of the tender of a check. But now what happens next, and this is crucial in the law of rescission, what does the plaintiff do? Does he conduct himself in a way that is inconsistent with the continued existence of the contract? Yes. Because there isn't a single thing that Mr. Horstman can point to. Not a letter. Not a recording. Not a phone call. Not an email. Nothing. Asking for the stones. Demanding performance of the contract. In fact, his conduct is the exact opposite. What does he do? Well, one of the things he testified to was that he would have sold the painting during this period. This goes on for four years. Four years where he doesn't make a peep to anybody. He testifies he had all kinds of ongoing dealings with the church. In fact, on the day of his deposition, he testified, this is over four years later, he testifies, excuse me, over nine years later, he testifies that he has sold the church $10,000 worth of things that morning of his deposition. And yet, during this entire period, four years, up to almost nine years, four years before the filing of the suit, he never once in all his dealings with the church, ever made a demand for performance of this contract. Never once. There's nothing in the record that you can point to. Now, that's not the only thing he did. You know, there was a gentleman by the name of Buell. And by the way, that's, Mr. Horstman said there was a motion to strike the rescission argument. That's wrong. The motion to strike that's in the record, with respect to the motion to reconsider, is a motion to strike some exhibits to the motion to reconsider. Exhibits that were actually part and parcel of things that were submitted in summary judgment. So it really wasn't new. That wasn't the new material. The new material were the videotapes. Your Honor is absolutely right. The videotapes were not produced until after the motion for summary judgment had been completely debriefed in art. But, in any event, what does he do? He starts collaborating with an author about this painting. The artist, Sutcliffe Maudsley, is this guy writing a book. His name is Buell. And what does Mr. Hiacek do? He holds himself out as the owner of the painting and asks that Mr. Buell attribute the painting to being in his private collection. Buell asks him, will you loan the painting to the museum? Salt Lake City, the church. So they can put it on display as we get ready to roll out my book. And he says, no, not unless they insure it. So he refuses. If he was acting in a manner that was consistent with the contract, he would have said, sure, they can have the painting. It's theirs. And they wouldn't even have to insure it because who would have the insurable interest in the painting if it were the churches? It would be the church. They wouldn't have to insure it because they wanted to. But he says, I'm not giving it to the church unless they'll insure it for $350,000. And the church says, no, we're not insuring it. So here's yet another opportunity for him to have tendered the consideration back and made a demand for performance of the stones. Nothing. Nothing. So you have every element that you need for both accord and satisfaction and rescission is met in this case. It's clear, it's decisive, it's conclusive. That's why summary judgment is appropriate. And when you look at the cases, and it's interesting, there are not a ton of rescission cases out there. Two of probably the most prominent ones in Illinois are from this district. It's the Volk case and the Pales case. Pales decided on summary judgment. But in both those cases, the elements are identical. It's the same thing, and what's intriguing about that is where rescission tends to come up is in cases like this involving real estate, shadows, unique items, claims for specific performance, and what does the court focus on? The court focuses on the party's conduct. Mr. Hiacek can say until he's blue in the face, I did not accept the painting back. I wanted my stones. But his conduct, which is what rescission and accord and satisfaction are all based on, is completely inconsistent with that. And that's the point that this court made in full. That's where the guy returned the truck, and the seller of the truck said, I didn't accept the truck back. And the court said, well, that's what you said, but you took the truck, and you exercised dominion and control over it, and then you sold it to a third party. Mr. Hiacek may not have sold the painting after it was returned to him, but he said he would have if somebody had offered him, that's page C462 of the record, he said if somebody had offered to buy his entire collection of Sutcliffe-Maudsley paintings, he would have sold this one right with it. Four years. That goes on before he was acquitted. You've got cases like Nelson v. Bales, where it's a sale of a home on contract, and the purchaser moves out after a notice of default has been declared, moves all their belongings out, and the seller doesn't have an opportunity to file a suit for a foreclosure action that you would file on a contract so that he can take back possession, but he just takes back possession, and then he doesn't hear anything from this guy, so he sells the house to a third party, and then all of a sudden the original buyer comes back and says, I want them evicted, I want the house back, and this court said, no, you abandoned that contract. There may not have been a formal, you know, notice of forfeiture of the contract for sale, but you abandoned it, so this man was free to go ahead. So, would we give the stones to somebody else at this point? Sure, we could have, just as he could have sold the painting, but the point is, the contract was made clear the deal was off. And there's even letters. There's a letter from Elder Pinnock, and again, I think Mr. Horstman mischaracterizes the record when he says that Mr. Hayek was told, don't worry, you'll get the stones, it may be a year or so, we'll see. Look at the letter from Elder Pinnock. Elder Pinnock's letter, which is dated a month after the painting was returned, says, we don't think we're going to ever give you the stones. You know, we can talk about it, but right now, you're unlikely to get the stones now, if ever. Because we're rebuilding the temple, that was what the evidence shows, they were reconstructing it. They needed these original stones in order to model the stones that they were going to make to reconstruct the temple out of. There's a couple of points. I touched on the fact that rescission was not pleaded originally. You know, I don't know the answer to that. It was not trial counsel, but I will tell you that the videos were tendered, and the audio recordings were tendered. And immediately after that, there is a tremendous amount of effort of discovery to try and authenticate them. And I think that in fairness to trial counsel, before you're going to start to tender these things to the judge as additional material, you want to make sure you've got foundation, you want to make sure that it's authentic. And so a lot of discovery, you'll see there's a lot of discovery back and forth about ESI electronically storing information and seeking confirmation. And eventually, and there were some discovery disputes about that, and that has to get, I think, resolved before, some of it has to get resolved. There has to be some assurance. And ultimately, when you look at the answers to interrogatories, you'll see all the evidentiary foundation is there. The answers in interrogatories, he created it, how he created it, what he created, that it was done, he testifies it was done to actually preserve the events that occurred. So all the foundation that you could want is ultimately provided, and then it's submitted in the form of a motion to reconsider. Was there an objection during the hearing on the motion to reconsider? Not to the rescission argument, no. With respect to the rescission argument? No. None whatsoever. There's no objection to rescission, and there's no objection in their written response. What there is... Did they respond to rescission? And I'm sorry, I didn't look at the pleadings. They did not. They did not. They did not argue in opposition. Well, they argued in opposition to it, but they did not object to the raising. They did argue in opposition. Yeah, they said that there were still questions of fact. But they didn't object to the timing of raising that defense. What they did object to, and what the motion to strike relates to, is the exhibits about Mr. Hayacek's dealings with Mr. Buell, the author of the record, because there were some additional things that were thrown in. You know, some things from Mr. Hayacek's website, the correspondence between him and Mr. Buell. These were things that they felt should be stricken from the record. Counselor, time is up. Unless the court has questions, further questions, I hope. There was a lot of recovery here trying to sort of work through some other additional facts that I thought would help the court understand the timing, the sequence of what actually happened. Thank you very much, Mr. Vincent. Mr. Horstman, rebuttal. Thank you, Your Honor. One thing I would ask is this business of whether there was a contract and what its terms were, I'm a little bit blindsided because of the concession. If the court is going to get into that, I hope I would have an opportunity to maybe file a supplemental brief. I mean, we can get into that, but it's not been part of the appeal up to this point. This is such a fact-intensive appeal. It really requires the court to look in great detail. We obviously disagreed on a lot of points here as to what the record shows. But I can point out a few things. First, the videotapes. Both parties recognized and agreed that they are not complete. Both parties made transcriptions and they're not even consistent. The episode where Mr. Hiacek receives the painting at his home, the testimony shows that was like an hour event and the tape is 13 minutes. So not only is it inaccurate, it's not complete. Mr. Hiacek never vouched for the accuracy of this. The way it came out is he presented it as a disclosure for discovery purposes. He's fully aware of the flaws of this thing. He's no professional recording person. Plaintiffs certainly did object. The first breach is when the defendants refused to convey the stones to Mr. Hiacek. I cite the court to page C-243. It's a lengthy, almost legal argument. It's a presentation that Mr. Hiacek gives to the defendants saying, this is the deal. I assume that you're going to live up to it and here's why it's a good deal. It's a wonderful, almost legal argument, but he certainly does object and he states all the reasons what he thinks the agreement is and why he thinks that they should conform to it. Here's somewhat an argument and in the briefs, defendants say a lot about, you know, there was no, Hiacek never objected. In four years, he never objected. Well, the truth of the matter is they never elicited any testimony except for the first couple of months in this four year period. There's no evidence at all as to what the defendants did or what the plaintiff did or said. We have the first few months where Mr. Hiacek continues to try to make contact with Elder Pinnock. He travels to Nauvoo. He travels to Salt Lake City. He keeps asking what's going on. He sends him, gets a professional appraisal of the painting in April of 2000. Sends it to Elder Pinnock again, suggesting, you know, this is a good deal for you. I want to go through with the thing. As to whether there was an objection to the rescission theory, I don't have a site but my recollection is that there is an motion to strike. Then it's in the hearing. I believe that there definitely was an objection but I have to defer to the record on that. Counsel said it was misrepresented the record in saying that the defendants told him that he could have the stones. I refer to page 35 of my opening brief. I've got a block quote. These are the words of Mr. Goodwin. It's told to the plaintiff and it's quoted there in the record, page C660 in the record. I'll pull out the parts that I like and Goodwin tells him, I will make sure that you get what you want. You can't have them yet. That's Goodwin speaking or an account of him speaking. So there were the representations and then Leonard tells him, just be patient. I'm sorry about the delay. On accord and satisfaction, there's another admission and they admit that there was no substitute contract. If there's no substitute contract, there can't be any accord and satisfaction and I agree with them. There's no substitute contract. With respect to Mr. Buell, Buell never asked to borrow the painting for his book. He asked to borrow the painting for a museum exhibit. Defendants never asked to borrow the painting. So when Mr. Hiacek said, I'm not going to loan the painting because there's not sufficient insurance, that was in response to Mr. Buell's request that he, Buell, could borrow the painting. So it wasn't, we weren't refusing to loan the painting to the defendants themselves. Big difference in this court's Volk opinion, Volk was tried. That's a trial case and that's a critical thing here. Sure you can draw these inferences and Mr. Vincent has done a great job in his brief, in his argument showing that there's some evidence to support their theories, but he doesn't and can't eliminate all the material questions of fact. This can't be done as a matter of summary judgment, especially when the trial judge is hearing live testimony  reaching conclusions that are directly adverse to Mr. Hiacek's testimony. We ask the court to reverse the summary judgment. If there are no questions, I thank you. Again, I'm always the confused member of the court. What is your position with respect to whether we can reach the issue of rescission? Because I don't know if your client wants us to consider that issue now, or what's your position? Do you want us to be limited to the pleadings? I just need to just as counsel conceded the issue of contract, what is your position with respect to rescission? Given my brothers, it was a brand new issue in the motion to reconsider. Because the trial judge was leaving the bench, the proceedings were truncated. Certainly if the plaintiff would prefer to have an opportunity to be able to present evidence and prepare a case on the rescission theory, that would be the preference, and the procedural grounds for doing that is it really wasn't properly before the trial court at the time. Do you argue in your brief that there was no new evidence and no mistakes on issues of law by the trial court that would justify a motion to reconsider? I spent a lot of time in trial courtrooms and often had motions to reconsider. Sometimes they felt like they were automatic. Is there any case law to support the fact that a motion to reconsider cannot be heard in the trial court without new evidence or without an argument that the court misapplied the law? They did it all the time. My position was if I screwed up, I wanted to fix it. But you argue that the trial court abused its discretion because there was no new evidence. Right. I think a motion to reconsider, the purpose of it is to bring new evidence or new legal theories that couldn't have been presented before. I think it was improper to bring this. All of the evidence was literally in the defendant's hands for a couple of months before the judge ruled on the motion for summary judgment. It could have and should have been brought up. It's not newly discovered evidence in any meaningful sense. They had it. Plaintiffs had it. Only the trial judge hadn't seen it because the defendants didn't present it, although they believed that that evidence supported their case. I don't know if this is a pertinent observation or not, but it appears to me that counsel was just doing it this way was better than asking for sanctions because the discovery was small. But I may be reading too much into it. I think that's unfair because I think there's enough in the record to see that this was, it was discovered under strange circumstances. Mr. Hayacek, because he had moved and because he had transferred data from one place to another, there's an explanation. And he discovered this late in the game that there was never any suggestion on the other side that he had committed fraud on the court or anything like that. I appreciate your input. Thank you. Thank you. We appreciate your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in recess until 1.15.